UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

═══════════════════════════════

ROYAL HOUSING, LLC,

**DECISION AND ORDER**
14-CV-880

Plaintiff,

v.

CITY OF JAMESTOWN, NEW YORK,
et al.,

Defendants.

═══════════════════════════════

## I. INTRODUCTION

Plaintiff, the owner and landlord of an apartment house in Jamestown, New York, alleges that Defendants, municipal officials, condemned its building in a manner that violated Plaintiff's rights under the Fourth and Fourteenth Amendments. Docket No. 1. Currently before the Court are the parties' cross-motions for summary judgment. Docket Nos. 17, 19.

In support of Plaintiff's Motion for Summary Judgment on the issue of liability, Plaintiff submits a Statement of Undisputed Facts (Docket No. 17-1), Attorney Affidavit (Docket No. 17-2), Declaration of Harold W. Whitford, Jr. (Docket

No. 17-3), Declaration of Brenda L. Strasser (Docket No. 17-4), and Memorandum of Law (Docket No. 17-5).

Defendants submit, in support of their opposition and cross-motion, a Statement of Undisputed Facts (Docket No. 19-2), an Attorney Declaration (Docket No. 19-3), Supporting Declarations (Docket No. 19-4), and Memorandum of Law (Docket No. 19-5). They also submit an Opposing Statement of Undisputed Material Facts. Docket No. 20. Plaintiff has filed a Reply. Docket No. 21.

Oral argument on the pending motions was held before Magistrate Judge Kenneth Schroeder on January 26, 2016. The parties held a mediation session on October 31, 2017, after which the parties agreed to a potential settlement, contingent upon the approval of the Jamestown City Council. Docket No. 26.

On November 20, 2017, the Jamestown City Council rejected the proposed settlement, and Defendants thereafter moved, unopposed, to reopen the matter and restore it to the Court's calendar. Docket No. 29. The Court granted Defendants' motion on May 15, 2018 (Docket No. 30), and now addresses the pending Motions for Summary Judgment.

## II. FACTUAL BACKGROUND

The following facts are undisputed unless otherwise noted.

### Parties

Plaintiff Royal Housing LLC ("Plaintiff") is a limited liability company organized under the laws of the State of New York.

Defendant City of Jamestown ("Jamestown") is a municipal corporation with offices located at 200 E. Third Street, Jamestown, County of Chautauqua, State of New York. Defendant Samuel Teresi ("Teresi") is the Mayor of the City of Jamestown.

Defendant Vince DeJoy III ("DeJoy") is the Director of Development for the City of Jamestown. In that capacity, he directs and supervises various code enforcement personnel, including Defendant Greg Moran ("Moran"). Moran was an employee of the City of Jamestown until his retirement on November 15, 2014, performing the jobs of "Rehab and Code Enforcement Officer" and "Housing Inspector." The City of Jamestown, Teresi, DeJoy, and Moran are collectively referred to herein as "Defendants."

## The Subject Property

Plaintiff is the owner of the premises commonly known as 1091 E. Second Street in the City of Jamestown ("the subject property"). The subject property is a two-story home that contains five apartments, numbered 1 through 5.

Plaintiff is the property's owner and acting landlord in renting the five apartment units. Until September 5, 2014, four of the five apartments were rented pursuant to month-to-month tenancies. Whitford Decl. ¶¶ 6-7; Strasser Decl. ¶¶ 6-7.

According to Plaintiff, the tenants of Apartments 1 and 2 had continuously rented their respective apartments for over one year. Plaintiff's LLC members deny knowledge of any arrest of those tenants for narcotic sales or any other criminal

activity throughout their tenancy. They further deny knowledge that any tenants at the subject property were participating in or supporting the use or sale of narcotics at 1091 E. Second Street. Whitford Decl. ¶¶ 9-10; Strasser Decl. ¶¶ 9-10.

Apartment 5 was last rented for the month of June 2014, and was vacant during the months of July and August 2014. Approximately two weeks before September 4, 2014, Harold Whitford and Brenda Strasser, the LLC's members, inspected Apartment 5, observed it to be vacant, unfurnished, and showing no signs of occupancy. The door and windows to the apartment were locked and secure at that time, and the utilities to the unit were turned off. Whitford Decl. ¶¶ 7-8; Strasser Decl. ¶¶ 7-8.

**Jamestown City Code and Condemnation Process**

Defendant DeJoy has the power to condemn properties in the City of Jamestown and may delegate that power to subordinate code enforcement officers. In order to effectuate a condemnation, a sign is posted on the premises to communicate that the premises are not to be occupied for any reason.

The Jamestown Department of Development has the power to issue "Notices of Violation," which are notices that inform of code violations present at a property and state that such issues need to be addressed by a certain date or further action will be taken. Said Notices are issued by code enforcement officers, in writing, and are posted on the premises as well as being mailed to the address of the titled owner. In the event of noncompliance with a Notice of Violation, a code

enforcement officer can take the property owner to court by issuing an appearance ticket.

During his deposition, DeJoy explained that a "Notice to Vacate" was a written notice to the occupants and owners of a property requiring that the property be vacated. The authority for these Notices comes from Chapter 215 of the Jamestown City Code. DeJoy Dep. 31-33, 38. Code enforcement officers can issue Notices to Vacate. DeJoy can also direct a Notice to Vacate be issued but he had never personally issued one himself. DeJoy Dep. 33-34, 37.

A "Property Rehabilitation and Conservation Board of Appeals" is also described in Chapter 215 of the Jamestown City Code. The parties dispute whether the Board has ever convened. DeJoy Dep. 38-39; Whitford Decl. ¶ 29; Strasser Decl. ¶ 19; Def. Opp'n Stmt. ¶ 22. One way to convene a Property Rehabilitation and Conservation Board of Appeals is by filing an appeal to a Notice of Violation.

Section 215 of the Jamestown City Code is a building code statute which reads, in pertinent part:

> Whenever the Director of Development at any time finds that a violation of this chapter exists which requires immediate action to abate a direct hazard or immediate danger to the health, safety or welfare of the occupants of a building or of the public, he may, without prior notice of hearing, issue an order citing the violation and directing that such action be taken as is necessary to remove or abate the hazard or danger. Such order may include an order to vacate. Notwithstanding any other provisions of this chapter, such an order shall be effective immediately upon service.

Jamestown City Code § 215-62.

Likewise, "unfit premises" are defined as:

> (1) Structures lacking ventilation, sanitation, heat or other facilities adequate to protect the health and safety of the occupants or the public.

> (2) Structures or premises which are damaged, decayed, dilapidated, unsanitary, unsafe or infested in such a manner as to create a hazard to the health and safety of the occupants or the public.

> (3) Structures or premises which because of the location, general condition, state of the premises or number of occupants are unsanitary, unsafe and overcrowded or are otherwise detrimental to health and safety that a hazard to the occupant or the public is created.

*Id.* § 215-6. In turn, "hazard" is defined as "condition which bears a high potential for harm to the health or safety of an individual or property," *Id.* § 215-6, and "nuisance" is defined merely as a "violation of [§ 215]." *Id.* § 215-46.

### **Drug Raid and Subsequent Condemnation of the Subject Property**

On September 4, 2014 at approximately 10:40 a.m., the Jamestown Police Department Drug Enforcement Unit ("DEU") executed a search warrant at the subject property. Tenants of Apartments 3 and 4 were arrested during the raid. No search of Apartments 1 and 2 was conducted and no tenants from those Apartments were arrested.

The day following the raid, Defendants DeJoy and Teresi conducted an "impromptu" meeting with the Jamestown Police Chief Harry Snellings, in the

Mayor's office. DeJoy Dep. 46.  Between the date of the search warrant and the September 5th  meeting, DeJoy did not contact Plaintiff, the property's owner.  *Id.* at 49-50.

At the meeting, DeJoy raised the possibility of condemning the subject property due to complaints made by neighbors regarding the poor condition of the property, unauthorized motor vehicle repairs being performed on the property, and the fact that one of the individuals arrested during the raid was also arrested at a different property of Plaintiff's on a prior occasion. DeJoy Dep. 51. DeJoy communicated to Teresi and the Police Chief that he believed the property, which was located "on the footprint of the Jamestown Community College campus," rose to the level of a "nuisance of public safety." DeJoy Dep. 52. The Police Chief agreed that the house should be condemned, while Teresi indicated that he wanted to consult corporation counsel. *Id.*

DeJoy's recommendation of condemnation was based upon suspected narcotics-related activity by the tenants at the subject property. He sought to exclude those tenants, as well as other individuals suspected of purchasing narcotics, from returning to the property. DeJoy Dep. 55-56. He testified that "neglect and mismanagement [was occurring] on the part of the landlord" because another individual had been arrested for a drug offense at another one of Plaintiff's properties in Jamestown. DeJoy Dep. 100.[1]

---

[1] According to Defendants, Plaintiff either owns or manages over 350 properties in the City of Jamestown. Atty. Decl. (Docket No. 19-3) ¶ 5.

On September 5, 2014 (the date of the meeting), Teresi directed DeJoy to condemn the subject property, which DeJoy understood to mean invoking Chapter 215 of the Jamestown City Code. DeJoy Dep. 59, 61-62. DeJoy then verbally delegated the condemnation responsibility to Defendant Moran. *Id.* at 62-64.

Moran went to the subject property and nailed a notice on the exterior stating the following:

> City of Jamestown, New York
>
> TAKE NOTICE – THIS BUILDING/APARTMENT IS CONDEMNED by order of the Department of Development and is not to be occupied until a Certificate of Occupancy has been issued.
>
> Property Address: Name, address & phone of owner:
> 1091 E. 2nd St. Royal Housing LLC
> 132 ½ Prospect St.
> Jamestown
>
> The owner of this property has failed to bring it into compliance with Chapter 215 of the Code of the City of Jamestown. This building/apartment shall remain posted and unoccupied until cited code violations have been remedied and an inspection is conducted by the inspector listed below. Additional legal action is being pursued against the owner by the Department of Development in Jamestown City Court.
>
> Note: The owner or other occupants of this building may have been authorized by the Department of Development to be on the property during designated hours to remove personal items and/or furnishings.
>
> For additional information please contact the Department of Development at 483-7541.
>
> Greg Moran 483-7660          9/5/14
> HOUSING INSPECTOR          DATE OF POSTING

THE UNAUTHORIZED REMOVAL, MUTILATION OR COVERING UP OF THIS NOTICE IS PUNISHABLE BY FINE OR IMPRISONMENT OR BOTH

BUILDING TO BE DEMOLISHED YES ___ NO <u>X</u>

Compl. ¶ 49; Answer ¶ 49; DeJoy Dep. at 64, ln. 18-22; Whitford Decl. ¶ 15.

On the same date, Defendant Moran mailed Plaintiff a letter with an enclosure titled "Notice to Vacate," which reads, in pertinent part:

PLEASE TAKE NOTICE there exists [sic] violations of the Jamestown City Code for the premises known as 1091 E 2nd St.

The specific violation(s) is/are designated as follows: Declared nuisance

in violation of Section 2015-46

YOU ARE HEREBY ORDERED to vacate the premises at 1091 E 2nd St on or before the 5th day of September, 2014.

Compl. ¶ 56; Ex. A.

Defendant DeJoy testified that it was his decision to use the above language, and he communicated this decision verbally to Moran. DeJoy Dep. 66-67. DeJoy also authorized the wording of the Notice posted on the exterior of the subject property. *Id.* at 68. DeJoy directly approved all of Moran's actions, which were in the scope of Moran's duties. *Id.* at 70.

Moran also hand-delivered copies of the "Notice to Vacate" to tenants who were present in the building at the time. The "Notice to Vacate" contained no language informing the tenants or Plaintiff that any of them had the right to a

hearing or the right to appeal the "Notice to Vacate," or of any other methods and appurtenant deadlines for challenging the Notice. Whitford Decl., Ex. A. Moran spoke to the tenant of Apartment 1 and Harold Whitford and informed them that they had to gather their belongings and vacate the premises. Compl. ¶ 52; Answer ¶ 52; Whitford Decl ¶¶ 16-17. Harold Whitford telephoned DeJoy later that day to inquire why the property had been condemned. Whitford Decl. ¶ 20.

The parties do not dispute that prior to the execution of the search warrant, there was no discussion of condemnation of any portion of the subject premises. DeJoy Dep. at 45; Whitford Decl. ¶ 27; Strasser Decl. ¶ 17.

Plaintiff states that it was not notified in writing either before or after the posting of the condemnation sign of any procedure to contest the condemnation. Furthermore, Plaintiff asserts it was not provided with an opportunity to contest the condemnation prior to the posting of the condemnation sign and "Notice to Vacate." Whitford Decl. ¶¶ 27-28; Strasser Decl. ¶¶ 17-18. A letter from Moran dated September 5, 2014, notified Whitford of the condemnation, declaring it a "nuisance and/or immediate danger." It did not state procedures to contest the condemnation. Whitford Decl., Ex. B.

Defendants do not dispute the foregoing facts regarding notice and the letter. They assert, however, that Plaintiff was "familiar" with the procedures and processes of the Department of Development and simply did not avail itself of the procedures available to contest the temporary condemnation by failing to request

a hearing. Def. Opp'n Stmt. ¶¶ 38-40.  It is undisputed that no hearing was held concerning the condemnation of the subject property.

Plaintiff maintains that it was not presented with any form of notice instructing Plaintiff to commence an eviction against any of its tenants at the subject property prior to the condemnation.  Defendants respond that the temporary condemnation and resulting "Notice to Vacate" was done under emergency conditions. Whitford Decl. ¶ 31 & Ex. A; Strasser Decl. ¶ 21; Def. Opp'n Stmt. ¶ 41.

Plaintiff asserts that as of September 4, 2014, monthly rents for Apartments 1 through 4 totaled $1150. Apartment 5 was vacant and last rented in June 2014, and would normally rent for $375 per month. Whitford Decl. ¶ 7.

By letter dated November 6, 2014, addressed to Plaintiff, DeJoy lifted the condemnation of the subject property because he believed "the premises wasn't occupied by those who were perpetrating the narcotics activity." DeJoy Dep. 89. He testified that although other violations were still outstanding at the property, they did not warrant condemnation. *Id.* at 89-90. It was DeJoy's determination to lift the condemnation, and he informed Teresi of his intention to do so. *Id.* at 97-98.

On an unspecified date, a man by the name of Jose Diaz-Solis, who was not a tenant at the subject property, was found in the vacant unit, Apartment 5. Following the September 4th raid, Jose Diaz-Solis was charged with, *inter alia*,

burglary in the second degree in violation of New York Penal Law § 140.25, a Class C violent felony.

## III. DISCUSSION

### <u>Summary Judgment Standard</u>

A party is entitled to summary judgment if the party shows "that there is no genuine dispute as to any material fact and the [party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Thus, a court's role in deciding a summary judgment motion is "not . . .  to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. When considering a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

When resolving cross-motions for summary judgment, the same standards apply. "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Schwabenbauer v. Board. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)). "[W]hen both parties move for summary judgment, asserting the absence

of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Id.* at 121 (citations omitted).

**Pre-Deprivation Due Process**

Plaintiff moves for summary judgment as to liability on all claims in its Complaint, which asserts procedural and substantive due process violations and seeks declaratory relief. Pl. Mem. (Dkt. No. 17-5) at 1-21. The crux of this action, however, is Plaintiff's claim that the Defendants' condemnation of the subject property occurred without adequate pre-deprivation process.

"The Fourteenth Amendment prohibits a state from 'depriv[ing] any person of life, liberty, or property, without due process of law . . . . ' Due process requires that before state actors deprive a person of her property, they offer [him or] her a meaningful opportunity to be heard." *WWBITV, Inc. v. Village of Rouses Point*, 589 F.3d 46, 50 (2d Cir. 2009) (citing U.S. Const. amend. XIV, § 1; *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). "The Supreme Court has held, however, that in emergency situations a state may satisfy the requirements of procedural due process merely by making available 'some meaningful means by which to assess the propriety of the State's action at some time after the initial taking.'" *Id.* (quoting *Parratt v. Taylor*, 451 U.S. 527, 539 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986)). "Where there is an emergency requiring quick action and where meaningful pre-deprivation process would be impractical, the

government is relieved of its usual obligation to provide a hearing, as long as there is an adequate procedure in place to assess the propriety of the deprivation afterwards." *WWBITV*, 589 F.3d at 50 (internal citation omitted).

The parties do not dispute that Plaintiff had a constitutionally-protected property interest in the subject property and do not dispute that Plaintiff did not receive a pre-deprivation hearing or notice thereof. Thus, the sole disputed issue is whether Defendants properly invoked emergency procedures in condemning the subject property without a pre-deprivation hearing.

**Emergency Exception**

In determining whether an official properly invoked emergency procedures, the court must "accord the decision to invoke the procedure some deference and not engage in a hindsight analysis of whether [the situation] actually created an immediate danger to the public." *Catanzaro v. Weiden*, 188 F.3d 56, 62 (2d Cir. 1998). "Such hindsight analysis of [an official's] means of dealing with an emergency would encourage delay and risk increasing the public's exposure to dangerous conditions." *WWBITV*, 589 F.3d at 52. "If an official believes that the public is in immediate danger, he or she should not hesitate to invoke an emergency procedure for fear of being sued and being liable for damages should his or her decision turn out to be incorrect in hindsight." *Catanzaro*, 188 F.3d at 63.

"[T]he due process guarantee is offended only when an emergency procedure is invoked in an abusive and arbitrary manner; therefore, there is no constitutional violation unless the decision to invoke the emergency procedure

amounts to an abuse of the constitutionally afforded discretion." *Catanzaro*, 188F.3d at 62. "Whether the official abused his discretion or acted arbitrarily in concluding that a genuine emergency exists is a factual issue, subject to the usual considerations for a district court addressing a summary judgment motion." *WWBITV*, 589 F.3d at 51.

Defendants appear to rely upon *Catanzaro* for the proposition that their decision to condemn the subject property "must be analyzed very deferentially." Def. Mem. 9, quoting *Catanzaro*, 188 F.3d at 63

> This somewhat deferential standard finds strong support in policy considerations. The law should not discourage officials from taking prompt action to insure the public safety. By subjecting a decision to invoke an emergency procedure to an exacting hindsight analysis, where every mistake, even if made in good faith, becomes a constitutional violation, we encourage delay and thereby potentially increase the public's exposure to dangerous conditions. This quandary is exactly what these emergency procedures are designed to prevent, and is the primary reason they are constitutionally acceptable.

*Catanzaro* reiterated the well-established rule that "although notice and a predeprivation hearing are generally required, in certain circumstances, the lack of such predeprivation process will not offend the constitutional guarantee of due process, provided there is sufficient postdeprivation process." 188 F.3d 56, 61 (citing *Parratt, supra*). "'[E]ither the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the

requirements of procedural due process.'" *Id.* (quoting *Parratt*, 541 U.S. at 539).

The *Catanzaro* Court went on to hold that "where there is competent evidence allowing the official to reasonably believe that an emergency does in fact exist, or that affording predeprivation process would be otherwise impractical, the discretionary invocation of an emergency procedure results in a constitutional violation only where such invocation is arbitrary or amounts to an abuse of discretion." *Catanzaro,* 188F.3d at 62. "[T]here is no constitutional violation unless the decision to invoke the emergency procedure amounts to an abuse of the constitutionally afforded discretion." *Id.* "The inquiry is thus twofold: whether there was an emergency that required immediate action, and whether adequate post-deprivation remedies were available." *Canzoneri v. Inc. Vill. of Rockville Ctr.*, 986 F. Supp. 2d 194, 203 (E.D.N.Y. 2013) (citation omitted).

First, it is undisputed that the relevant portions of the Jamestown City Code at issue here do not encompass criminal activity or violations otherwise reserved to the Penal Law. To that end, Defendants submit no competent evidence that existed for them to reasonably believe that an emergency existed under the Jamestown City Code. Second, they make no attempt to argue, nor can they, as to why or how pre-deprivation process was impractical after the arrests were made. *See Catanzaro*, 188 F.3d at 63. Even if Defendants had submitted evidence that the drug dealing activities of Plaintiff's tenants constituted an "emergency," any emergency would have been abated upon the arrest and removal of those tenants suspected of illegal drug activity, which

occurred the day before the condemnation was ordered. The fact that the subject property was burglarized (presumably after the raid and the issuance of the "Notice to Vacate") is of little value to defeat Plaintiff's motion, as Defendants submit no admissible evidence that the burglary was a result of the previous drug activity at the subject property. Moreover, it does not appear that Defendants were aware that Apartment 5 had been burglarized at the time the municipality decided to condemn the subject property. Stated somewhat differently, this is not evidence that Defendants possessed at the time of invoking the emergency procedure.

Defendants have also failed to proffer competent evidence to create a genuine dispute as to whether they abused their discretion in determining that an emergency existed. To the contrary, Defendants circumvented, ignored, or were unaware of other established measures to address drug-related criminal activity, such as New York's so-called "Bawdy House" law.[2] Their invocation of a building as a substitute for criminal procedure was likewise arbitrary and arguably pretextual.[3]

---

[2] N.Y. Real Property Actions and Proceedings Law § 715(1) permits various interested individuals and enforcement entities to maintain a summary proceeding for the recovery of real property where such property is "used or occupied in whole or in part as a bawdy-house, or house or place of assignation for lewd persons, or for purposes of prostitution, or for any illegal trade, business or manufacture . . . . *Id.*

[3] In the civil forfeiture context, one Michigan district court aptly observed, "the purpose of civil forfeiture proceedings is to seize the property which facilitates drug transactions, and not primarily to stop the consumption or sale of drugs by people using the property. Criminal proceedings must be brought in order to restrain people from engaging in drug transactions." *U.S  v. A Leasehold Interest in Prop. Located at 850 S. Maple, Ann Arbor, Washtenaw Cty., Mich.,* 743 F. Supp. 505, 511 (E.D. Mich. 1990).

Defendants also submit no evidence that there was insufficient time to hold a pre-deprivation hearing. The undisputed facts and record evidence indicate that suspected offenders were already removed from the premises prior to the condemnation order. Rather, Defendants submit a sworn declaration by the Jamestown Chief of Police, Harry Snellings, stating:

> The eviction of only three (3) of the five (5) apartments would have left the remaining tenants subject to the likelihood that individuals seeking to purchase illegal drugs would have returned to the property . . . . If the entire building was not temporarily condemned, I had legitimate concerns individuals who had been coming to the residence in the past would return and would likely pose a threat to anyone who remained in the building or to the neighbors.

Snellings Decl. (Docket No. 19-4) ¶¶14-15.  Snellings' concerns that drug seekers would somehow threaten the remaining law-abiding tenants are highly speculative, and it is well-settled that defendants cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. United States Fire Ins. Co*., 804 F.2d 9, 12 (2d Cir. 1986). As noted by the Northern District of New York, "the mere suspicion of sporadic criminal activity is certainly not an emergency that would justify dispensing with plaintiff's constitutional rights." *Kassim v. City of Schenectady*, 255 F. Supp. 2d 32, 39 (N.D.N.Y. 2003), *aff'd in part, vacated in part, remanded*, 415 F.3d 246 (2d Cir. 2005).

In sum, the emergency condemnation procedure was not properly invoked because Defendants did not have a sufficient evidentiary basis to support their emergency finding. No reasonable jury could find otherwise. In light of this determination, the question of whether post-deprivation processes were sufficient need not be reached. *See Reynolds v. Krebs*, 336 Fed. Appx. 27, 29 (2d Cir. July 2, 2009) ("Where postdeprivation processes are adequate, due process is violated 'only when an emergency procedure is invoked in an abusive and arbitrary manner'.") (citing *Catanzaro* 188 F.3d at 61). (summary order)

**Qualified Immunity**

Defendants, in their cross-motion for summary judgment, contend that even if they violated Plaintiff's constitutional rights, they are nonetheless entitled to qualified immunity. Def. Mem. 5-6.

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Even if the rights in question are clearly established, a government actor may still be shielded by qualified immunity if "it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (holding that an official is entitled to qualified immunity so long as his "actions could reasonably have been thought consistent with the rights . . . .  violated.").

19

Plaintiff has established that Defendants arbitrarily and unnecessarily declared an emergency for the purpose of condemning Plaintiff's property without regard for its due process rights. In light of this determination, the Court cannot conclude that Defendants' actions were objectively reasonable. In making this conclusion, the Court reiterates that it was objectively unreasonable for Defendants to have believed that their actions were appropriate under the Jamestown City Code, which is a building code statute and does not encompass criminal activity. Accordingly, Defendants are not entitled to qualified immunity. *See, e.g., Cinema Art Theater, Inc. v. City of Troy*, 810 F. Supp. 2d 489, 500 (N.D.N.Y. 2011) ("In this case, the court has already determined that the failure to afford the Theater a predeprivation hearing may have amounted to a procedural due process violation. Thus, because questions of fact exist in that respect, and given [the municipal defendants'] involvement in the inspection and decision to remove the marquee, the court is not currently persuaded that [they] are necessarily entitled to qualified immunity."); *Vision for Children, Inc. v. City of Kingston, New York*, No. 115CV016, 2017 WL 9249665, at *19 (N.D.N.Y. June 7, 2017) ("assuming that Defendants arbitrarily and unnecessarily declared an emergency for the purpose of demolishing Plaintiff's property without regard for Plaintiff's due process rights, the Court cannot conclude that Defendants' actions were objectively reasonable."). Defendants' motion for summary judgment on the basis of qualified immunity is therefore denied.

For all of the preceeding reasons, Plaintiff's motion for partial summary judgment (Docket No. 17) is granted on the issue of liability with respect to the Complaint's "First Claim for Relief (Lack of Pre-Deprivation Hearing and Notice Thereof in Violation of the Procedural Due Process Requirement of the Fourteenth Amendment)." Docket. No. 1.

In light of the Court's findings above, it need not reach the merits of Plaintiff's alternative claims for relief, which are predicated on identical conduct analyzed herein.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment is GRANTED on the issue of Defendants' liability for a violation of Plaintiff's procedural due process rights. Defendants' cross-motion for summary judgment seeking qualified immunity is DENIED.

The Clerk of Court is directed to terminate the motions pending at Docket Nos. 17 and 19.  The parties shall appear in person for a status conference on October 8, 2021 at 9:30 a.m.

SO ORDERED.


_ _s/Richard J. Arcara_ _ _ _ _ _ _
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT JUDGE

DATED: October 1, 2021